**Duane ROSS, Allen Ross, Sandra Fleury and Peggy Geffre, for themselves and others similarly situated, Plaintiffs,**

*v.*

**FLANDREAU SANTEE SIOUX TRIBE, d/b/a Flandreau Santee Sioux Tribe, Inc., and/or Royal River Casino; the Flandreau Santee Sioux Tribal Executive Committee; Vice–President, George Allen, Jr.; Secretary–Treasurer Sam Allen; Cheryl Redearth; Gordon Jones, Jr.; Manual Lujan, in his capacity as Secretary of the Interior, and the United States of America, Defendants.**

**No. CIV 91–4186.**

United States District Court, D. South Dakota, S.D.

Dec. 30, 1992.

Michael Abourezk, Gregory, SD, for plaintiffs.

Albert C. Jones, Santee Tribal Office, Flandreau, SD, Kurt Blue Dog, Bloomington, MN, for defendant Tribe.

John J. Ulrich, Asst. U.S. Atty., Sioux Falls, SD, for defendant US.

## AMENDED MEMORANDUM OPINION AND ORDER

JOHN B. JONES, Chief Judge.

### I.

### BACKGROUND

Plaintiffs Duane Ross and others (Ross) are members of the Flandreau Santee Sioux Tribe (Tribe) living outside the boundaries of Moody County, South Dakota.

The Tribe entered into a gaming compact with the State of South Dakota, and has established the Royal River Casino as a tribally owned gaming business on tribal trust land. The casino has been very profitable, with the Tribe receiving about $300,000 per month as its share of the casino profits. The profits have been allocated for various purposes, with 35% being allocated for distribution to tribal members. Exhibit 14.

Commencing in March, 1991, the Tribe has distributed payments to tribal members and some "adopted" persons all of whom live within Moody County, South Dakota. No payments have been made to tribal members living outside Moody County which engendered this lawsuit.

The facts are not in dispute and the case was submitted on the record for decision on December 22, 1992.

The Tribe is a federally recognized Indian tribe organized under the Indian Reorganization Act of 1934, Exhibit 1, with a Federal Charter of Incorporation granted by the Secretary of the Interior. Exhibit 2. The most recent tribal membership rolls indicate a tribal enrollment of 611 persons. Of these members, 158 live within Moody County, South Dakota, and 453 live outside Moody County.

Unlike many Indian tribes, the Tribe has no defined territorial boundaries.[1] It is an "open" reservation with no defined exterior boundaries.

Historically, the local members of the Tribe, as well as the United States Government, have considered Moody County, South Dakota as a type of boundary line, thereby creating a de facto boundary line. The Secretary–Treasurer of the Tribe testified that the Indian Health Service, the USDA Commodity program, and certain Tribal contracts for services all define Moody County as the "service area" for eligibility to receive benefits under these programs. The Tribe's Constitution defines qualified voters as enrolled members of the Tribe who reside within Moody County. Flandreau Santee Sioux Tribe Constitution, Article III, Section 2. Exhibit 1.

## II.

### JURISDICTION

This action was commenced in this court alleging federal question jurisdiction. 28 U.S.C. § 1331.

The primary focus of this litigation relates to an interpretation of the Federal Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701 et seq., and the Court finds that it has federal question jurisdiction.

To the extent that the plaintiffs seek relief beyond an interpretation of this statute and which might impact the Tribe's defense of sovereign immunity, those issues will be addressed later in the opinion.

## III.

### ISSUES

1. The primary and threshold issue is whether the Tribe has complied with the provisions of the IGRA in making the per capita payments complained of.

An affirmative answer would require a dismissal of this action. A negative answer raises additional issues.

2. Whether the plaintiffs have standing to bring this action.

3. Whether plaintiffs are entitled to any relief under the Indian Civil Rights Act.

4. The extent to which the Tribe is protected by the doctrine of sovereign immunity.

5. Whether plaintiffs are entitled to any relief against the federal defendants.

## IV.

### DECISION

1. Compliance with 25 U.S.C. § 2710(b)(3)

   *a. Approval Under the Indian Gaming Regulatory Act*

The IGRA specifically addresses the issue of per capita payments which are made out of Indian gaming revenues. Pursuant to the IGRA, an Indian tribe may use Indian gaming revenues to make per capita payments to its members only if the plan

---

**1.** The Flandreau Tribe's Constitution states: "The jurisdiction of the Flandreau Santee Sioux Tribe of Indians shall extend to such territory as may now be held or hereafter acquired by or for the Flandreau Santee Sioux Tribe under any laws of the United States, except as otherwise provided by law." Flandreau Santee Sioux Tribe Constitution, Article I. Exhibit 1.

has been approved by the Secretary of the Interior.   25 U.S.C. § 2710(b)(3).[2]

(3) Net revenues from any Class II gaming activities conducted or licensed by any Indian tribe may be used to make per capita payments to members of the Indian tribe only if—

(A) the Indian tribe has prepared a plan to allocate revenues to uses authorized by paragraph (2)(B); [3]

(B) the plan is approved by the Secretary as adequate, particularly with respect to uses described in clause (i) or (iii) of paragraph (2)(B);

(C) the interests of minors and other legally incompetent persons who are entitled to receive any of the per capita payments are protected and preserved and the per capita payments are disbursed to the parents or legal guardians of such minors or legal incompetents in such amounts as may be necessary for the health, education, or welfare, of the minor or other legally incompetent person under a plan approved by the Secretary and the governing body of the Indian tribe; and

(D) the per capita payments are subject to Federal taxation and the tribes notify members of such tax liability when payments are made.

25 U.S.C. § 2710(b)(3). The statutory language clearly requires Secretarial approval of per capita distribution plans before any such distribution may be made.

### b. Tribal Gaming Ordinance

■ The Tribe contends that its per capita distribution program complies with the provisions of § 2710(b)(3) by virtue of Secretarial approval of Tribal Gaming Ordinance No. 89–04.   Exhibit 3.   This ordi-

nance was passed to satisfy the IGRA's requirement that before an Indian tribe can engage in Class II or Class III gaming it must pass an ordinance authorizing such gaming activity and the ordinance must be approved by the Chairman of the National Indian Gaming Commission.   25 U.S.C. § 2710(b)(1)(B) & (d)(1)(A).   Section 31 of Gaming Ordinance No. 89–04 states:

Section 31.   *Per Capita Payments*

The [Executive] Committee may, at its discretion, issue per capita payments of the gaming proceeds to tribal members. The Committee shall notify the tribal members that such per capita payments are subject to federal income taxation.

This is the only reference the gaming ordinance makes to per capita payments.   The ordinance does not contain a plan to allocate revenues as required by § 2710(b)(2)(B).   Additionally, no provision is made in the ordinance for protection of the interest of minors and other legally incompetent persons as required by § 2710(b)(3)(C).

In a July 26, 1990 letter a Bureau of Indian Affairs ("BIA") representative stated that the Department of the Interior's position was that the Tribe's gaming ordinance met the requirements of the IGRA.[4] Exhibit A.   Based on this statement, the Tribe asserts that approval of the gaming ordinance constitutes approval of its per capita distribution plan.

■ Section 31 of the Tribe's gaming ordinance merely provides that the tribal Executive Committee has the authority to issue per capita payments.   The IGRA provides that per capita payments may be made from Indian gaming revenues only if

---

**2.** Although § 2710(b)(3) addresses Class II gaming, its provisions are made applicable to Class III gaming pursuant to § 2710(d)(1)(A)(ii) and (2)(A).

**3.** 25 U.S.C. § 2710(b)(2)(B) provides as follows:

(B) net revenues from any tribal gaming are not to be used for purposes other than—
(i) to fund tribal government operations or programs;
(ii) to provide for the general welfare of the Indian tribe and its members;

(iii) to promote tribal economic development;
(iv) to donate to charitable organizations; or
(v) to help fund operations of local government agencies.

**4.** The IGRA requires approval by the Chairman of the National Indian Gaming Commission. However, since the National Indian Gaming Commission is not yet fully operational, the Secretary of the Interior is the interim approving authority.

the Indian tribe has prepared a *plan* to allocate revenues for specified uses and that plan has been approved by the Secretary of the Interior. 25 U.S.C. § 2710(b)(3). Section 31 is not such a plan and approval of Gaming Ordinance No. 89–04 does not constitute approval of a plan for per capita distribution of Indian gaming revenues as envisioned by the IGRA.

### c. Per Capita Plans Submitted by the Tribe

The Tribe has submitted three proposed per capita distribution plans to the Secretary of the Interior for approval. Exhibits 14, 29, 40. Each of these plans limits the payment of gaming revenues to tribal members residing within Moody County. None of these plans have yet been approved.

The first of these proposed distribution plans, Resolution No. 91–23 (Exhibit 14), was enacted on April 14, 1991. This resolution does not specifically address the issues set out in § 2710(b)(2) & (3). The resolution states that the distribution plan will be as follows: 43% for economic development; 7% for tribal operations; 35% to the membership; 10% for a community fund; and 5% to a trust fund for minors.

The second proposed distribution plan, Resolution No. 92–10 (Exhibit 29), was enacted on January 30, 1992, apparently in reaction to this litigation. This plan is more detailed than Resolution No. 91–23 and specifically addresses the provisions of § 2710(b)(2) & (3). The resolution states that a tribal member must be a resident of Moody County for one year to be eligible to receive per capita payments. The first resolution only required a 90 day residency.

The most recent proposed distribution plan, Resolution No. 92–50 (Exhibit 40), was enacted on December 4, 1992. This resolution is even more detailed than Resolution No. 92–10 and also specifically addresses the provisions of § 2710(b)(2) & (3). Other than being more detailed, this resolution is substantially the same as Resolution No. 92–10.

The Tribe argues that the Court is required to stay its hand pending the outcome of BIA review of the Tribe's latest revenue allocation plan, Resolution No. 92–50. The Tribe contends that its latest plan meets the requirements of the IGRA and that if the Court takes any action concerning the Tribe's revenue distribution plan it will inhibit administrative review of that plan.

■ The Court is not deciding the question of whether any of the three revenue distribution plans submitted by the Tribe meet the requirements of the IGRA for approval of such plans. The Court is concluding that absent approval by the Secretary of the Interior or a duly delegated official, any per capita distribution of Indian gaming revenues fails to comply with the requirements of the IGRA.

■ The Tribe has also sought to avoid the provisions of IGRA relating to per capita payments by making reference to the payments made to members as "interim payment" (Exhibit 10), Reservation Lifestyle Betterment Grants (Exhibit 20), and On–Reservation Lifestyle Betterment Grants (Exhibits 20 and 27). Just as a rose by any other name is still a rose, a per capita payment by any other name is still a per capita payment. All of the payments made to tribal members living in Moody County are per capita payments within the meaning of the IGRA.

### 2. Standing

■ In order for plaintiffs to have standing to maintain this action, three requirements must be met: (1) plaintiff must have sustained an injury in fact or an invasion of a legally protected interest which is concrete and particularized and actual or imminent, not merely conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely as opposed to merely speculative that the injury is redressable by a favorable decision. *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted).

Plaintiffs meet these requirements.

■ While the Secretary could approve a distribution of gaming proceeds that does not make an equal distribution to all tribal members, such approval has not yet been given.

As tribal members, plaintiffs have a right to share in per capita payments made to members generally. Until the Secretary approves a different plan of disbursement, all per capita payments must be distributed to all enrolled members. The distribution of per capita payments to some enrolled members but not to these plaintiffs establishes an injury to them.

The Tribe has disbursed tribal funds in violation of the IGRA and clearly intends to continue doing so unless restrained by court decision. There is a clear causal connection between this conduct and the injury to plaintiffs.

A favorable decision will end the distribution of per capita payments without the Secretary's approval. While it is possible that a plan might be approved which would approve distribution of all gaming profits to tribal members living in Moody County and none to members living elsewhere, I would consider it unlikely, considering the Secretary's Guidelines relating to per capita payments. (Exhibit 101).

### 3. Indian Civil Rights Act

■ Plaintiffs concede that the Indian Civil Rights Act, 25 U.S.C. §§ 1301 et seq., standing alone, does not provide this Court with jurisdiction to hear disputes between an Indian tribe and its members. Plaintiffs essentially argue that since BIA guidelines for the evaluation of per capita distribution plans (Exhibit 101) state that such plans must not violate the Indian Civil Rights Act, the requirements of the Indian Civil Rights Act are somehow subsumed within the provisions of the IGRA relating to per capita distribution plans.

Both the United States Supreme Court and the Eighth Circuit have clearly spoken as to whether federal courts have jurisdiction to hear disputes between an Indian Tribe and its members alleging violations of the Indian Civil Rights Act. The only relief available in federal court under the Indian Civil Rights Act is a writ of habeas corpus. *Runs After v. United States,* 766 F.2d 347, 353 (8th Cir.1985). Federal Courts have no jurisdiction to either enjoin or award monetary damages for any other violations of the Indian Civil Rights Act. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 72, 98 S.Ct. 1670, 1684, 56 L.Ed.2d 106 (1978); *United States v. Turtle Mountain Housing Authority,* 816 F.2d 1273, 1275–76 (8th Cir.1987); and *Runs After,* 766 F.2d at 352–53. Simply because BIA guidelines for approval of per capita distribution plans under the IGRA prohibits such violations does not alter this jurisdictional fact.

### 4. Sovereign Immunity

The Tribe and tribal officials assert that this action should be dismissed on the basis that they possess sovereign immunity.

The issue of sovereign immunity must be considered separately as to these issues: (a) compliance with the provisions of the IGRA; (b) relief under the Indian Civil Rights Act; (c) monetary damage claim against the Tribe; and (d) monetary damage claim against tribal officials.

■ (a) Having elected to engage in casino gambling under the IGRA, the tribe is required to comply with that law. The Court is well aware of the extensive case law holding that waivers of sovereign immunity by an Indian tribe must be unequivocally expressed. However, the Tribe cannot reap the benefits of the IGRA and simultaneously refuse to comply with the statutorily mandated provisions relating to the distribution of Indian gaming revenues.

As the United States Supreme Court recognized in *Oklahoma Tax Comm'n v. Potawatomi Indian Tribe,* 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), tribal sovereign immunity does not excuse an Indian tribe from all obligations. *Id.* 498 U.S. at ——–——, 111 S.Ct. at 911–912. By engaging in Class II and Class III gaming the Tribe has assumed certain obligations, and by not complying with the IGRA in distributing gaming profits the Tribe has failed to satisfy those obligations. As Justice Stevens' concurrence points out, the *Potawatomi* Court impliedly recognized that tribal sovereign immunity

does not necessarily extend to actions seeking equitable relief. *Id.* at ——–——, 111 S.Ct. at 912–913 (Stevens, J., concurring). Sovereign immunity cannot be invoked to preclude an inquiry into whether the Tribe has complied with the IGRA. Engaging in gaming pursuant to the IGRA constitutes an express waiver of sovereign immunity on the issue of compliance with the IGRA. To hold otherwise would make 25 U.S.C. § 2710(b)(3) a nullity.

(b) The Tribe's assertion of sovereign immunity is a valid defense to plaintiffs' claims under the Indian Civil Rights Act. As discussed above, federal courts are without jurisdiction to determine disputes between an Indian Tribe and its members under the Indian Civil Rights Act, other than petitions for writ of habeas corpus.

■ (c) To the extent that plaintiffs are requesting a judgment for monetary damages against the Tribe for past per capita distributions, the Tribe's sovereign immunity protects it from such a claim. To order the Tribe to expend monies from the tribal treasury to satisfy such a claim would violate the Tribe's immunity from suit. While the Court has the authority to enforce compliance with the IGRA, tribal sovereign immunity protects the Tribe from entry of a judgment for monetary damages in this Court.

■ On the other hand, as previously stated, tribal sovereignty does not permit the Tribe to disregard the plain mandates of the IGRA. It is the view of the Court that tribal sovereignty is not violated by requiring that all casino profits hereafter accruing be deposited with the Clerk of this Court and be held by the Clerk pending approval of a per capita payment plan for the Tribe by the Secretary of the Interior or his designees.

Once a per capita payment plan is approved, the Court after a further hearing will determine how to distribute the funds being held by the Clerk and when the deposits with the Clerk will be terminated. All parties will be entitled to be heard thereon.

It is the tentative view of the Court that any approved per capita payment plan could be given retroactive effect if the approved plan provides for any per capita payments to non-resident tribal members by using the funds then held or thereafter acquired by the Clerk.

■ (d) Unless plaintiffs can show that the individual tribal officials are acting outside of, or in excess of, the scope of their authority, plaintiffs are not entitled to monetary damages from those individuals. Absent such a showing, tribal officials acting in their official capacity are protected by the Tribe's sovereign immunity to the same extent the Tribe is protected. *United States v. Oregon,* 657 F.2d 1009, 1012 n. 8 (9th Cir.1981). Plaintiffs have failed to make such a showing and therefore are not entitled to monetary damages from the individual tribal defendants in this Court.

### 5. . Federal Defendants

Count VIII of plaintiffs' amended complaint seeks monetary damages from Manual Lujan and the United States of America on the theory that these defendants breached their trust and fiduciary responsibilities to these plaintiffs by not restraining the Tribe from making per capita payments in the absence of an approved plan. I have previously determined that plaintiffs' monetary claims against the federal defendants must be dismissed.

■ Plaintiffs now argue that the Court should order the Secretary to disapprove the pending per capita payment plan. No authority is cited for the proposition that district courts can review or direct the discretion of the Secretary in making the decision to approve or disapprove a per capita distribution plan under 25 U.S.C. § 2710(b)(3)(B), and it is the view of the Court that it lacks such power.

The Secretary of the Interior has adopted and distributed Guidelines to Govern the Review and Approval of Per Capita Payments (Exhibit 101) as of December 21, 1992. The guidelines provide in part:

ELIGIBILITY FOR PER CAPITA: The tribe should establish its own criteria for

determining whether all members or identified groups of members shall be eligible to receive per capita payments. When the Revenue Allocation Plan calls for distribution of per capita payments to an identified group of members rather than all members, the tribe shall provide a justification for limiting such payments to the identified group of members. The justification must establish a rational basis for making payments to the identified group of members. The tribe must insure that the distinction between members eligible to receive payments and members ineligible is reasonable and not arbitrary, does not discriminate, or otherwise violate the Indian Civil Rights Act. The tribe's justification must comply with the tribe's governing or organic documents.

These guidelines appear to the Court to be well thought out, and require the Tribe to establish a rational basis for making distinctions in determining members eligible for per capita payments. The only rational basis for limiting per capita payments to voting members of the Tribe that has been submitted to the Secretary for consideration, as contained in Exhibit 40, Resolution No. 92–50, is to satisfy the needs of tribal members who contribute to the tribe by residing on or near the reservation.

This case graphically demonstrates the wisdom of Congress in requiring Secretary approval of all plans to make per capita payments from gaming profits. The Tribe has 611 members, of which 158 are voters and 453 are non-voters in tribal elections. The voters decided that only they would receive per capita payments and that the non-voters would receive nothing.

## V.

### CONCLUSION

In deciding the issues raised by this litigation, the Court finds:

1. That plaintiffs have standing to bring this action.

2. That 25 U.S.C. § 2710(b)(3) requires that a distribution plan be approved by the Secretary of the Interior before the Tribe can make per capita payments to any members.

3. That there is no approved plan in existence under which the Tribe can make per capita payments.

4. That the Tribe has heretofore made per capita payments to persons living in Moody County, South Dakota in violation of the provisions of the IGRA.

5. That no further per capita payments can be made until there is in existence an approved plan.

6. That because it is probable that any approved distribution plan will provide for some per capita payments to all tribal members, all Tribal gaming profits should be deposited by the gaming management with the Clerk of this Court to be held pending the approval of a per capita payment plan and the further order of this Court.

7. That plaintiffs do not have any cause of action under the Indian Civil Rights Act and Count IV of the amended complaint must be dismissed.

8. That plaintiffs do not have any cause of action against defendants Manual Lujan, in his capacity as Secretary of the Interior or the United States of America, and the Clerk of Courts should enter judgment dismissing this action against them with prejudice.

9. That plaintiffs claim for conversion as set out in Count IX of the amended complaint must be dismissed without prejudice because this Court does not have jurisdiction to consider this claim because of defendants' sovereign immunity.

10. That plaintiffs' claim of individual liability against the individually named tribal officials as set out in Count IX of the amended complaint must be dismissed because those claims can only be litigated in tribal court.

## VI.

### APPEAL

The decision as outlined above resolves all issues in this case with one exception. Because the Tribe has been making per capita payments which have not been approved and have done so contrary to legal

advice which they received prior to making any per capita payments, the Court concludes that pending the approval of a plan for per capita payments, all tribal profits from gaming should be deposited with the Clerk. The Tribe is also distributing to the Moody County members funds that have been designated for other purposes. *See* Exhibits 43 and 44. This depositing of gaming funds is required in order to prevent further distributions in violation of the IGRA's provisions, and to insure that a fund will exist from which payments may be made to tribal members living outside of Moody County in the event that the approved plan makes provision for some per capita payments to such members.

A final judgment on all claims cannot be entered until a per capita payment plan is approved by the Secretary. The issues raised in this case are of first impression and are of great importance not only to these litigants but to all Indian tribes operating casinos under the IGRA. The decisions herein involve controlling questions of law as to which there is substantial ground for difference of opinion and an immediate appeal will materially advance the ultimate termination of this litigation. 28 U.S.C. § 1292(b). Because the decisions herein involve legal issues of first impressions, an obvious hardship will exist to all tribal members deprived of per capita payments during the pendency of this action and subsequent appeals, and because large sums of money will accumulate rapidly, a prompt review of this Order by the Court of Appeals for the Eighth Circuit would be in the best interests of all parties to this action.

### VII.

### ORDER

Upon the foregoing opinion and decision, and the record herein,

IT IS ORDERED:

(1) That plaintiffs' Motion to extend page limits on briefs, Doc. 136, is granted.

(2) That defendant Tribe's Supplemental Motion for dismissal or for summary judgment, Doc. 140, is denied.

(3) That the Tribe shall make no further per capita payment to any member until a per capita payment plan has been approved by the Secretary of the Interior pursuant to 25 U.S.C. § 2710(b)(3).

(4) That the management of the Royal River Casino, Rita, Inc., or its successor managers of such casino, shall hereafter deposit with the Clerk of this Court all profits to which the Tribe is entitled, pending approval of a per capita payment plan by the Secretary and the further order of this Court. The Clerk of this Court is ordered to deposit said monies into an interest-bearing account, and the Clerk shall receive proceeds equaling ten per cent of the total interest earned on said account as required by law.

(5) That all claims against defendants Manual Lujan and the United States of America are dismissed with prejudice.

(6) That all of plaintiffs' claims set out in Counts IV, IX and X of the Amended Complaint are dismissed without prejudice.

(7) That good cause exists for an immediate appeal under 28 U.S.C. § 1292(b).